Ralph GREENSLADE, Plaintiff,

v.

The CHICAGO SUN–TIMES and the Chicago Newspaper Guild, Local 71, Defendants.

No. 95 C 4643.

United States District Court, N.D. Illinois, Eastern Division.

June 24, 1996.

Robert J. Trizna, Michael D. Lee, Trizna & Lepri, Chicago, Illinois, for Plaintiff.

S. Richard Pincus, Michael L. Sullivan, Fox & Grove, Chartered, Chicago, Illinois, for The Chicago Sun–Times.

Kenneth E. Edwards, Chicago Newspaper Guild, Chicago, Illinois, for The Chicago Newspaper Guild, Local 71.

### MEMORANDUM OPINION AND ORDER

DENLOW, United States Magistrate Judge.

Plaintiff Ralph Greenslade (hereinafter "Greenslade") filed a four-count complaint (hereinafter "Comp.") against Defendants The Chicago Sun–Times (hereinafter "Sun–

Times") and The Chicago Newspaper Guild, Local 71 (hereinafter "Guild"). In count I, Greenslade alleges the Sun–Times discriminated against him on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* In count II, which was dismissed with prejudice pursuant to stipulation of the parties, Greenslade alleges that the Sun–Times discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* In count III, Greenslade alleges that the Sun–Times breached his employment contract by failing to conduct a good-faith investigation of his conduct before transferring him, and failing to follow the procedures set forth in the Collective Bargaining Agreement (hereinafter "CBA") for disciplinary actions. In count IV, Greenslade alleges that the Guild discriminated against him on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

There are two motions currently before the court. Sun–Times has filed a motion for summary judgment as to counts I and III. Guild has filed a motion for summary judgment as to count IV. For the reasons set forth below, the Sun–Times' motion for summary judgment is granted as to counts I and III, and the Guild's motion for summary judgment is granted as to count IV.

## I.  FACTUAL BACKGROUND

Greenslade is a forty-one year old married male who has been employed by the Chicago Sun–Times since 1980. (Guild 12 M ¶¶ 1 and 4). Greenslade worked in the sports department during his entire tenure until December 15, 1994, when he was transferred to the copy desk. (Guild 12 M ¶¶ 2 and 105). He has been a Guild member during his entire tenure with the Sun–Times. (Guild 12 M ¶ 3).

Laura Wagner ("Wagner") is a twenty-four year old female who was hired by Sun–Times in September, 1994 to work in the sports department as a copy editor. (Guild 12 M ¶¶ 5 and 8). Wagner was the only woman on the sports copy desk and worked in close proximity with Greenslade until his transfer. (Guild 12 M ¶¶ 6 and 9). They worked the 5:00 p.m. to 1:00 a.m. shift together three times a week. (Guild 12 M ¶¶ 10 and 11).

Several weeks after Wagner began working for the Sun–Times, she felt Greenslade was taking an "unnatural amount of interest" in her. (Wag.Dep. p. 27). Wagner's discomfort was attributed to various electronic mail messages, offers for rides home, and comments made by Greenslade. (Guild 12 M ¶¶ 13–50). Greenslade knew that he was becoming a "pain in the butt with these ride offers", but he couldn't help himself. (Guild 12 M ¶ 39). He sensed that he was making Wagner uncomfortable and was aware that Wagner was trying to distance herself from him. (Guild 12 M ¶¶ 39 and 40). Wagner began to feel physically ill when she had to work with Greenslade. (Wag.Dep. p. 104). After one of the incidents, Greenslade called his supervisor, Deputy Managing Editor Rick Jaffe (hereinafter "Jaffe"), and told him "he was being mentally tortured, he couldn't sleep at night, the situation was making it difficult for him to work, and that he had brain cramps." (Guild 12 M ¶¶ 50–53). Jaffe and Greenslade then decided that the best course of action would be for Greenslade to stop sending electronic mail messages and stop offering rides to Wagner. (Guild 12 M ¶ 55).

Sometime following this discussion, Greenslade and Wagner discussed the "situation" whereupon Wagner learned that Greenslade had talked to Jaffe. (Guild 12 M ¶¶ 61–69). The next night, Greenslade again electronically mailed a message to Wagner asking her if she wanted a ride home. (Guild 12 M ¶ 72). Wagner declined the ride offer. (Guild 12 M ¶ 73). Soon thereafter Wagner met with Jaffe to relate her side of the story. (Wag.Dep. p. 147–158). Jaffe then contacted Greenslade's supervisor, Editor Mark Nadler (hereinafter "Nadler") to advise him of the situation between Greenslade and Wagner. (Guild 12 M ¶ 78). Nadler then contacted Guild Unit Chair Charles Nicodemus (hereinafter "Nicodemus") to inform him that he and Jaffe were planning to have a meeting with Greenslade and wanted assurances that Guild representation would be available for Greenslade if he so requested. (Guild 12 M

¶¶ 82–85). Guild representation was available. (Guild 12 M ¶ 86).

Jaffe, Nadler and Greenslade met on December 15, 1994 to discuss the situation in the sports department. (Guild 12 M ¶¶ 91–101). Greenslade was repeatedly told he was entitled to Guild representation and several times declined to have a Guild representative during the meeting. (Guild 12 M ¶¶ 92–98). During this meeting, it became clear to Nadler and Jaffe that Greenslade and Wagner needed to be separated. (Guild 12 M ¶¶ 99). Nadler informed Greenslade that the Sun-Times would be temporarily transferring him to the copy desk in the news department. (Comp. ¶ 11). Jaffe and Nadler had discussed transferring Wagner, but because Greenslade was a better layout person and he was scheduled to be transferred out of the sports department and into the pagination area they decided to transfer Greenslade. (Guild 12 M ¶¶ 99–102). Greenslade was transferred to the copy desk effective December 15, 1994, and again transferred to the pagination department effective May 22, 1995. (Guild 12 M ¶¶ 105–106). All the positions held by Greenslade were in the editorial department and his base pay remained the same throughout each of his transfers. (Sun–Times 12 M ¶ 11, 48). Greenslade lost some overtime pay while on the copy desk and while training for the pagination position. (Sun–Times 12 M ¶ 48). After his transfer to the pagination department, Greenslade did not wish to return to the sports department. (Guild 12 M ¶ 107).

After the meeting with Nadler and Jaffe, Greenslade contacted Nicodemus in order to tell him that he had been transferred. (Guild 12 M ¶ 110). Nicodemus and Greenslade met and discussed his transfer. (Guild 12 M ¶¶ 111–115). Nicodemus then informed Guild leader Susy Schultz (hereinafter "Schultz") of Greenslade's transfer. Schultz then commenced an investigation on behalf of the Guild. (Guild 12 M ¶¶ 119–120). As part of her investigation, Schultz interviewed Stu Courtney, a sports department employee, Greenslade and Wagner. *Id.* During Schultz' investigation several Guild members and representatives discussed the matter

with Greenslade and with Wagner. (Guild 12 M ¶¶ 120–136).

Following the investigation the Guild set up a meeting with the Sun–Times. (Guild 12 M ¶¶ 137–140). Then several Guild representatives met with Greenslade, his wife, and his attorney. At this meeting no decision was made on whether to file a grievance. (Guild 12 M ¶¶ 141–142). Shortly thereafter, several Guild leaders decided that it would be difficult to proceed on the merits of Greenslade's case, however, this course of action was not communicated to Greenslade. Correspondence was exchanged between the Guild and Greenslade for some time after the meeting discussing the status of the complaint and the positions of both Greenslade and the Guild. The Guild leadership then had a meeting in February of 1995 and formally decided not to file a grievance on Greenslade's behalf. (Guild 12 M ¶¶ 146–160). The Guild's position was communicated to Greenslade in a letter dated February 28, 1995. (Guild 12 M ¶ 197).

In a letter dated May 26, 1995, Greenslade advised the Guild that "[i]f you have a final proposal for action against the Sun–Times, please put it in writing and provide it to me by the close of business on Friday, June 2, 1995." (Guild 12 M ¶ 198). In response to Greenslade's letter, the Guild reaffirmed its decision that it would not proceed with his complaint on any level. (Guild 12 M ¶ 199). The Guild did not respond to Greenslade because the Guild members believed their position had already been communicated to Greenslade. *Id.*

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–555, 91 L.Ed.2d 265 (1986). This standard is applied with added rigor in employment discrimination cases, where intent and

credibility are crucial issues. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmovant. *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). To avert summary judgment, however, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A summary judgment proceeding is not a vehicle for the resolution of factual disputes; it is designed to determine whether there is any material dispute of fact that requires a trial. *Id.* If no reasonable jury could find for the party opposing the motion, it must be granted. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

### III. GENDER DISCRIMINATION CLAIM

#### A. Claim Against the Chicago Sun–Times

Greenslade has failed to raise a material fact question that the Sun–Times' decision to transfer him was the result of sex discrimination. Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e–2(a)(1).

Greenslade can prevail on his Title VII claim in one of two ways. *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir.1993), cert. denied, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). Greenslade can meet his burden of proof by offering direct proof of discriminatory intent. *Id.* However, Greenslade has not chosen this evidentiary path, and has instead relied on the more common indirect burden-shifting method of proof first set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the McDonnell Douglas framework, the plaintiff must first establish a *prima facie* case of sex discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). Once established, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action. If defendant meets the burden, plaintiff must demonstrate that the employer's proffered reason is pretextual and that the employer's real reason for the adverse action was discriminatory. *Hill,* at 667–8.

Because Greenslade is a male his claim is one of reverse discrimination.[1] To establish a *prima facie* case of reverse sexual discrimination, Greenslade must show that (1) he was meeting the employer's legitimate expectations; (2) he suffered an adverse employment action; and (3) his employer treated similarly-situated employees outside his classification more favorably. *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 668 (7th Cir.1995).

The Sun–Times' decision to separate Greenslade and Wagner because of the discomfort they were each feeling while working in close proximity with one another was totally proper. Greenslade has failed to establish a *prima facie* case of sexual dis-

---

1. While it is clear that Title VII protects members of both majority and minority groups from gender based discrimination, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279–280, 96 S.Ct. 2574, 2578–2579, 49 L.Ed.2d 493 (1976), it is not clear that the McDonnell Douglas formula applies in Title VII reverse discrimination cases. As the Seventh Circuit has noted, it remains an open question in this circuit whether the McDonnell Douglas formula applies in reverse discrimination cases. *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 668 n. 2 (7th Cir.1995).

crimination. While Greenslade is able to meet the first element he is unable to show that he suffered an adverse employment action or that he was replaced by someone of a different gender. Greenslade alleges that he suffered an adverse employment action when he was transferred to the copy desk. However, Greenslade did not receive a lower salary, he retained the same benefits, he remained in the editorial department, and the transfer was only temporary until the transfer to the pagination area was processed. The presence or absence of discriminatory animus in a transfer situation hinges not on the subjective feelings of an employee but rather on the objective nature of the change in assignment and the employer's intent in making the transfer. *Spring v. Sheboygan Area School District*, 865 F.2d 883, 885–6 (7th Cir.1989); *President v. Illinois Bell Tel. Co.*, 865 F.Supp. 1279, 1286 (N.D.Ill.1994). The Sun–Times was merely alleviating a situation between two of its employees. Because no reasonable jury could find discriminatory animus or that Greenslade's transfer was adverse, we must grant summary judgment. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

Furthermore, Greenslade has failed to show that a reasonable jury could find that he was replaced by someone of a different gender. Mark Nadler, vice-president and executive editor at Sun–Times, testified that Bob Mutter, a male, replaced Greenslade. (Nadler Dep. P. 173). Also, Greenslade testified that Bob Mutter was transferred to replace him in the sports department. (Pl.Dep. P. 378). Accordingly, Greenslade has failed to establish a *prima facie* case of reverse sexual discrimination and Sun–Times' motion for summary judgment is granted as to count I.

■■ Although Greenslade has not established a *prima facie* case of reverse gender discrimination, the court will also address the reasons given by Sun–Times as to why they transferred Greenslade. Accordingly, the court will assume, *arguendo*, that Greenslade has satisfied all the elements of his *prima facie* case.

The court finds that the Sun–Times has articulated legitimate, non-discriminatory reasons for its actions and that Greenslade has failed to bring forth evidence that the Sun–Times' reasons are a pretext and that Greenslade's transfer was in fact motivated by gender. To survive a motion for summary judgement, Greenslade must produce materials of evidentiary quality that create an issue of fact as to whether the reasons offered by the Sun–Times for transferring him were pretextual and that sex discrimination was the real reason for the transfer. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

The Sun–Times transferred Greenslade to alleviate the situation that had developed in the sports department brought on by Greenslade's unwanted advances to Wagner. Greenslade has presented no evidence that female employees who engaged in similar conduct were or would have been treated any different. Greenslade offers only his self-serving affidavit that he believes the Sun–Times discriminated against him because his "overall sense" was that the Sun–Times had taken Wagner's side in the dispute. (Sun–Times 12 M ¶ 54). Greenslade must do more than challenge the judgement of his superiors through his own self interested assertions. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986).

■■ This court does "not sit as a super-personnel department that reexamines an entity's business decisions." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992). The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers. *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 658–659 (7th Cir.1991). Greenslade has not offered any evidence which creates an issue of fact that the Sun–Times was lying about their reason for transferring him. Greenslade must create an issue as to whether the employer honestly believes in the reasons it offers, not whether it made a

bad decision. *Sample v. Aldi, Inc.,* 61 F.3d 544, 549 (7th Cir.1995).

The Sun–Times has presented a legitimate, non-discriminatory reason for transferring Greenslade. Separating these two employees by transferring Greenslade to an equal position with little or no adverse consequences in order to diffuse a difficult working environment appears perfectly reasonable. Because Greenslade has failed to bring forth evidence that such reasons were a pretext and that his transfer was motivated by gender, the Sun–Times is entitled to summary judgment as to Count I.

### B. Claim Against the Newspaper Guild

■ Greenslade has also failed to raise a material fact question that the Guild's decision not to file a grievance on his behalf was the product of sex discrimination. To establish a *prima facie* case against the Guild under Title VII, Greenslade must show all of the following elements: 1) the Sun–Times violated the Collective Bargaining Agreement with respect to him; 2) the Guild let the breach go unrepaired, thereby breaching its own duty of fair representation; and 3) some evidence indicates that gender animus motivated the Guild. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Bugg v. Int'l Union of Allied Industrial Workers of America,* 674 F.2d 595, 598 n. 5 (7th Cir.1982).

■ Greenslade has failed to establish a *prima facie* case against the Guild. Greenslade alleges the Sun–Times violated the CBA when it transferred him. However, there is no provision in the CBA which prevents the Sun–Times from transferring employees to another department. In fact, Greenslade was looking forward to the very action which he now condemns. Namely, he was anticipating being transferred from the sports copy desk to the pagination area. Therefore the court finds that the Sun–Times did not violate the Collective Bargaining Agreement in transferring Greenslade.

■ Greenslade has failed to show that a reasonable jury could find that the Guild breached its duty to fairly represent him. A Union breaches its duty of fair representation when its decision not to pursue a grievance is arbitrary or based on discriminatory or bad faith motives. *Trnka v. Local Union No. 688, UAW,* 30 F.3d 60, 61 (7th Cir.1994). "Existence of a genuine issue as to any one of [these] three elements suffices to defeat a summary judgment motion." *Griffin v. Air Line Pilots Ass'n, Int'l,* 32 F.3d 1079, 1083 (7th Cir.1994).

■ A "union only violates the arbitrary prong of the analysis when the union's actions are so far outside a range of reasonableness that the actions rise to the level of irrational or arbitrary conduct. Under this extremely deferential standard, courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley v. Schwitzer Div., Household Mfg. Inc.,* 961 F.2d 1293, 1302 (7th Cir.1992). The Guild did process Greenslade's complaint but declined to file a grievance on the basis that "the Guild determined that [Greenslade's] actions towards Ms. Wagner were inappropriate, that the [Sun–Times] did not violate the [CBA] when it transferred [Greenslade], ... and the Guild could not successfully challenge the substantive merits of the case." (Def. Motion for Summary judgment p. 5). This decision was made after months of investigation by the Guild which included 1) interviews with Greenslade and Ms. Wagner; 2) meetings with the Guild Attorney and Executive Director; 3) meetings with Greenslade and his attorney; and 4) a meeting with the Sun–Times. (See Def. Exs. 1, 2, 7, 11, 12, and 15–17). A reasonable jury could not find that the Guild's actions in processing Greenslade's complaint were arbitrary or irrational. Therefore, the court finds that the Guild's decision not to file a grievance on behalf Greenslade was not arbitrary.

■ The "discriminatory motives" element of the test for determining whether a Union breached its duty of fair representation coincides with Greenslade's Title VII claim. When a Title VII claim is predicated on a breach of a duty to represent, a Plaintiff must show that there was a breach of that duty and that "there was some indication that the Union's actions were motivated by

discriminatory animus." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir.1985).

Greenslade has failed to produce evidence which could show a reasonable jury that the Guild had a gender-tainted motivation. Greenslade has not compared the representation he received with that of any other Union member. Looking at the evidence in the light most favorable to Greenslade, as we must, the only reference the court can find as to the dissimilar treatment of Union members is found in the "Reopener" document authored by Unit Chair Charles Nicodemus. (Def.Ex. 19). In that document Nicodemus refers to various claims that were filed on behalf of other members in making his case to reconsider the Guild's decision with respect to Greenslade. However, all the instances referred to involve males. Greenslade has to show at least some evidence that his complaint was treated differently than the complaints of similarly situated female Guild members.

■ Greenslade argues that Schultz showed discriminatory animus by stating that her decision not to support filing a grievance on Greenslade's behalf was affected because the dispute was between a male and a female. A Union's refusal to handle a grievance on the basis of discriminatory animus violates the duty of fair representation. *Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1248 (7th Cir.1990). However, Schultz did not make the decision regarding Greenslade's complaint. Rather, the Guild leadership made the decision. Greenslade and his attorney met with the Guild several times and relayed all the information necessary for the Guild to make its determination. Several members of the Guild testified that the decision was an arduous one.

For instance, Schultz testified that she reached her decision "through much pain and agony and a lot of discussion". (Schultz Dep. p. 82–83, 94, 106). Guild leader Dan Lehmann, a reporter, based his opinion not to file a grievance on the following: 1) advice of the Guild Attorney and Guild Executive Director; 2) he felt there was no contract violation; and 3) he felt the Guild would not be successful in arbitration over the matter. (Def.Ex. 16). Guild leader Jim Montalbano based his opinion not to file a grievance on the following: 1) he felt there was no contract violation and the Sun–Times could transfer employees at will; 2) that there was no evidence that Greenslade had been transferred due to sexual harassment; and 3) he felt the Guild would not be successful in arbitration over the matter. (Def.Ex. 17).

The Guild's decision not to file a grievance on behalf of Greenslade was based on its own assessment. Had Schultz contaminated the Guild's decision making process then the failure to fairly represent Greenslade would be attributed to the Guild because it would have affected its decision. *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990). However, there is no hint that Schultz contaminated the Guild's decision making process. Therefore, the court finds that the Guild's decision not to file a grievance on behalf of Greenslade was not motivated by discriminatory intent.

■ The Guild processed Greenslade's complaint in a good faith manner. "In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a non-arbitrary manner, make decisions as to the merits of particular grievances." *Vaca v. Sipes*, 386 U.S. 171, 194, 87 S.Ct. 903, 919, 17 L.Ed.2d 842 (1967). When Greenslade provided evidence to the Guild it had a duty to investigate the claim. The Guild processed the claim and investigated the matter for several months. (Guild 12 M ¶¶ 110–210). Only after this investigation and a reconsideration of Greenslade's complaint did the Guild decide that filing the grievance was a fruitless endeavor.[2] "If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be

---

**2.** The Guild points out that at the time the investigation was concluded, even if the Guild decided to pursue Greenslade's complaint, there was no remedy to be sought. Greenslade was scheduled to be transferred to the pagination area, which is what he wanted, so if the Guild did file the grievance and seek the remedy of having him transferred back to the sports copy desk, the Guild would actually be acting contrary to the wishes of Greenslade.

substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation." *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967). Accordingly, the court finds that the Guild did not breach its duty to fairly represent Greenslade and the Guild's motion for summary judgment is granted as to count IV.

## IV. BREACH OF CONTRACT CLAIM

■ Count III against the Sun–Times alleges a common law breach of contract claim. "Unless the [Guild] violated its duty of fair representation, [Greenslade] cannot litigate his claim of breach of contract, because the [Guild's] responsibilities as the exclusive representative of the members of the bargaining unit include responsibility for the decision whether to prosecute a grievance on the employee's behalf." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1179 (7th Cir.1993). Because the court finds that the Guild has not breached its duty of fair representation, Greenslade cannot litigate his breach of contract claim. Accordingly, the Sun–Times' motion for summary judgment is granted as to count III.

## V. CONCLUSION

For the foregoing reasons, **The Chicago Sun–Times' motion for summary judgment is hereby GRANTED as to counts I and III and The Chicago Newspaper Guild's motion for summary judgment is hereby GRANTED as to count IV.**

**SO ORDERED.**